No. 24-239

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

TERADYNE, INC.,

*Plaintiff-Appellant,*

v.

ASTRONICS TEST SYSTEMS, INC.

*Defendant-Appellee*

_____

On Appeal from the United States District Court
for the Central District of California
No. 2:20-cv-02713
Hon. George H. Wu

_____

## APPELLANT'S OPENING BRIEF

_____

Douglas H. Hallward-Driemeier
Matthew J. Rizzolo
Kathryn Thornton
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel: 202-508-4600

Evan Gourvitz
Michael Morales
Meredith Foor
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
Tel: 212-596-9000

James R. Batchelder
ROPES & GRAY LLP
1900 University Avenue, 6th Floor
East Palo Alto, CA 94303
Tel: 650-617-4000

*Counsel for Appellant*
*Teradyne, Inc.*

# CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellant Teradyne, Inc. respectfully states that it has no parent corporation. The Vanguard Group owns over 10 percent of Teradyne's stock.

Date: April 9, 2024

Respectfully submitted,

*s/ Matthew J. Rizzolo*
Matthew J. Rizzolo
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel: 202-508-4600

*Counsel for Appellant Teradyne, Inc.*

ii

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF AUTHORITIES ....................................................................v

INTRODUCTION ...........................................................................1

JURISDICTIONAL STATEMENT .............................................................3

ISSUES PRESENTED.......................................................................3

STATUTORY AUTHORITIES ...............................................................4

STATEMENT OF THE CASE...............................................................5

SUMMARY OF THE ARGUMENT ..........................................................12

ARGUMENT ..............................................................................18

    I.      STANDARD OF REVIEW AND RELEVANT LAW ......................18

    II.    FACTOR ONE—IN DETERMINING THAT FACTOR ONE FAVORED FAIR USE, THE DISTRICT COURT IGNORED GENUINE ISSUES OF MATERIAL FACT REGARDING "TRANSFORMATIVENESS" .........................................19

        A.    The District Court Improperly Ignored Teradyne's Evidence That ATS's Use "Supersedes" and Replaces Teradyne's Copyrighted Works in the Market ...........................................21

        B.    Because ATS's Use Was Not Intermediate or on a New Platform, *Sony, Sega*, and *Google-Oracle* Do Not Support the District Court's Factor One Conclusion ...................................24

    III.   FACTOR TWO—THE DISTRICT COURT FAILED TO MAKE THE APPROPRIATE INQUIRY UNDER THIS COURT'S PRECEDENT, AND MATERIAL FACT DISPUTES REMAIN .....28

A.    The District Court Failed to Consider or Evaluate Whether ATS's Copying Was Necessary to Achieve Its Purported Purpose of "Compatibility"......................................................29

B.    The District Court Failed to Consider or Evaluate Teradyne's Investments in Its Copyrighted Software Works......................32

IV.    FACTOR THREE—THE DISTRICT COURT ERRONEOUSLY IGNORED MATERIAL FACT DISPUTES AND FAILED TO UNDERTAKE THE REQUIRED WORK-BY-WORK ANALYSIS33

A.    The Parties Dispute Material Issues of Fact Concerning the Amount and Substantiality of Copying by ATS......................34

B.    Further Ignoring Teradyne's Evidence, the District Court Improperly Treated All Sixteen Teradyne Works as a Single Work—and Incorrectly Shifted the Burden to Teradyne to Provide Otherwise.....................................................................37

V.    FACTOR FOUR—THE DISTRICT COURT IMPROPERLY SHIFTED THE BURDEN TO TERADYNE AND RESOLVED OR IGNORED DISPUTES OF MATERIAL FACT ON HARM CAUSED BY ATS'S INFRINGEMENT ...........................................39

A.    The District Court Improperly Shifted the Burden to Teradyne to Show Harm ........................................................................40

B.    The District Court Improperly Defined the Relevant Market as a Matter of Law.........................................................................41

C.    The District Court Improperly Resolved Factual Disputes on the Harm Caused by ATS's Infringement ...............................44

CONCLUSION....................................................................................53

STATEMENT OF RELATED CASES ....................................................54

CERTIFICATE OF COMPLIANCE.........................................................55

CERTIFICATE OF SERVICE ................................................................56

iv

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Agron, Inc. v. Lin*,
  No. CV0305872MMM(JWJX), 2004 WL 555377 (C.D. Cal. Mar.
  16, 2004) .......................................................................................43

*Cambridge Univ. Press v. Patton*,
  769 F.3d 1232 (11th Cir. 2014) ........................................................37

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).........................................................................18

*De Fontbrune v. Wofsy*,
  39 F.4th 1214 (9th Cir. 2022) ...........................................................41

*Dr. Seuss Enterprises, L.P. v. ComicMix LLC*,
  983 F.3d 443 (9th Cir. 2020) ............................ 16, 38, 40, 41, 47, 48

*Ericsson, Inc. v. Harris Corp.*,
  352 F.3d 1369 (Fed. Cir. 2003) ..................................................16, 43

*Goodman v. Staples The Office Superstore, LLC*,
  644 F.3d 817 (9th Cir. 2011) ............................................................18

*Google LLC v. Oracle Am., Inc.*,
  141 S. Ct. 1183 (2021).............. 16, 18, 19, 23, 24, 33, 38, 39, 43, 44, 48, 49, 50

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985).......................................................13, 21, 39, 41

*Kelly v. Arriba Soft Corp.*,
  336 F.3d 811 (9th Cir. 2003) ............................................................35

*Marvix Photographs, LLC v. Livejournal, Inc.*,
  873 F.3d 1045 (9th Cir. 2017) ..........................................................19

*May v. Sony Music Ent.*,
  399 F. Supp. 3d 169 (S.D.N.Y. 2019) ...............................................43

*Narell v. Freeman*,
    872 F.2d 907 (9th Cir. 1989) ............................................................12

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
    724 F.3d 1268 (9th Cir. 2013) ..........................................................23

*Scheuring v. Traylor Bros.*,
    476 F.3d 781 (9th Cir. 2007) ......................................................18, 23

*Sega Enters. Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1992) ..............................2, 14, 24, 29, 30

*Shakur v. Schriro*,
    514 F.3d 878 (9th Cir. 2008) ......................................................1, 12, 19

*Sony Comput. Ent., Inc. v. Connectix Corp.*,
    203 F.3d 596 (9th Cir. 2000) ............... 2, 5, 14, 24, 25, 26, 27, 29, 31

*Toho Co. v. William Morrow & Co.*,
    33 F. Supp. 2d 1206 (C.D. Cal. 1998) ...........................................35

*Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dep't*,
    447 F.3d 769 (9th Cir. 2006) ......................................2, 14, 32, 33

*Walt Disney Prods. v. Air Pirates*,
    581 F.2d 751 (9th Cir. 1978) ............................................................31

**Statutes**

17 U.S.C. § 107 ..............................................................3, 13, 18, 21, 37, 44

17 U.S.C. § 501(b) ......................................................................................3

28 U.S.C. § 1291 ........................................................................................3

28 U.S.C. § 1331 ........................................................................................3

28 U.S.C. § 1338 ........................................................................................3

28 U.S.C. § 2107 ........................................................................................3

**Other Authorities**

9th Cir. R. 28-2-2 ......................................................................................3

vi

C.D. Cal. Local R. 56-1 ................................................................37

Fed. R. Civ. P. 54 ........................................................................3

Fed. R. Civ. P. 56(c) ..................................................................18

Fed. R. App. P. 4(a)(1) ................................................................3

Fed. R. App. P. 28 ........................................................................3

*Nimmer on Copyright*, § 13F.08 ................................................39

## INTRODUCTION

Plaintiff-Appellant Teradyne, Inc. ("Teradyne"), the leading manufacturer of automatic test equipment, brought suit against its competitor, Defendant-Appellee Astronics Test Systems, Inc. ("ATS"), for copying portions of over a dozen copyrighted Teradyne software works that run Teradyne's test equipment into the ATS software that runs ATS's own competing test equipment.

While the evidence showed that ATS copied Teradyne's files—*including Teradyne's own copyright notices*—into ATS's own software, and while ATS admitted to some copying, it nevertheless moved for summary judgment on the affirmative defense of fair use. In doing so, ATS faced the double burden of prevailing on an affirmative defense at summary judgment, which this Court has held requires evidence "so powerful that no reasonable jury would be free to disbelieve it," *Shakur v. Schriro*, 514 F.3d 878, 890 (9th Cir. 2008).

In granting summary judgment and ruling that ATS overcame that extraordinarily high burden, the district court usurped the role of the jury, improperly both ignoring some material disputes of fact while resolving others in ATS's favor, including: (1) whether Teradyne's products containing the copyrighted works and the ATS products containing the infringing works directly compete against each other in the same market, (2) whether Teradyne's copied works and ATS's infringing works share substantially the same purpose, (3)

1

whether ATS had feasible alternatives to its copying, (4) the quantitative amount that ATS copied from each of Teradyne's works, (5) the qualitative importance of the Teradyne code copied by ATS, (6) whether ATS's copying caused and is likely to cause harm to the value of the copyrighted works, including in the form of lost profits and price erosion, and (7) whether ATS's copying threatens economic harm to the potential markets for those works, including licensing. The district court also misread and misapplied several of this Court's fair use precedents, including *Sony Comput. Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 603 (9th Cir. 2000), *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1526 (9th Cir. 1992), and *Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dep't*, 447 F.3d 769, 780 (9th Cir. 2006).

As described in detail below, the district court's improper grant of summary judgment deprived Teradyne of its right to a jury trial on its copyright infringement claim. Moreover, the district court's resolution of the highly fact-intensive fair use inquiry at summary judgment sets a standard that, if upheld, would permit direct competitors to copy proprietary software without authorization even where non-infringing alternatives were available, and thereby would significantly undermine the copyright protection afforded to software and discourage companies from future innovation. Accordingly, Teradyne respectfully requests that this Court

reverse and allow Teradyne to present its evidence, including on the issue of fair use, to the jury.

## JURISDICTIONAL STATEMENT

Pursuant to Rule 28 of the Federal Rules of Appellate Procedure and Circuit Rule 28-2-2, Teradyne submits the following statement of jurisdiction.

The United States District Court for the Central District of California had subject matter jurisdiction over this action pursuant to 17 U.S.C. § 501(b) and 28 U.S.C. §§ 1331 and 1338.

The district court entered final judgment on the sole claim in the underlying action on December 14, 2023. (Excerpts of Record "ER" 1-ER-0002–03.) The district court's judgment is final under Federal Rule of Civil Procedure 54, and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

Appellant appeals from the district court's December 6, 2023 order granting ATS's Motion for Summary Judgment (1-ER-0004–50) and entering final judgment for ATS on December 14, 2023 (1-ER-0002). The Notice of Appeal was filed on January 12, 2024 (3-ER-0309–407) and is timely pursuant to 28 U.S.C. § 2107(a) and Federal Rule of Appellate Procedure 4(a)(1).

## ISSUES PRESENTED

1. Did the district court err by granting summary judgment to ATS on its affirmative defense of fair use to Teradyne's claims of copyright

infringement, despite the existence of various disputed issues of material fact covering each fair use factor?

2. Did the district court err in finding to be "transformative" ATS's unauthorized incorporation of Teradyne's computer code for its automated test equipment products into ATS's own directly competing products that serve the exact same market and exact same customers?

3. Did the district court err by finding ATS's copying of Teradyne source code into its directly competing products analogous to *Sony Computer Entertainment, Inc. v. Connectix Corp.*, 203 F.3d 596, 603 (9th Cir. 2000), in which the copying at issue was for reverse engineering purposes; the copied code did not appear in the defendant's final product; and that copying enabled a new platform that did not directly compete with the copyright owner's own product?

## STATUTORY AUTHORITIES

*17 U.S. Code § 107 – Limitations on exclusive rights: Fair use*

"Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining

4

whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1)    the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2)    the nature of the copyrighted work;

(3)    the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4)    the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors."

## STATEMENT OF THE CASE

Founded in 1960, Teradyne is the leading manufacturer and supplier of automated test equipment ("ATE") used in the aerospace and defense industries, including branches of the U.S. military.  4-ER-0622 ¶4.  This case concerns particular Teradyne test equipment: the L-Series Tester, the M9-Series digital test instrument ("DTI") and the Di-Series DTI, which run tests to ensure that electronics in aircraft, missile launch systems, and radar and wireless communications systems are functioning properly and reliably.  4-ER-0622 ¶4; 4-

ER-0557 ¶¶1-2; 2-ER-0253–55, ¶¶12, 18; 19-ER-4396–97, 4402–4407; 18-ER-4061 ¶133; 2-ER-0162; 2-ER-0219.

Starting around 1978, Teradyne offered a digital subsystem as part of its L-Series Tester, which used software programs written in Teradyne's proprietary L200 programming language. 4-ER-0632 ¶10; 20-ER-4757 ¶35. In the late 1990s Teradyne started developing a new test instrument, the M9-Series DTI, which it officially released in June 1998. 4-ER-0632–33 ¶11. Teradyne then released its Di-Series DTI in 2005, with full production beginning in 2007. 4-ER-0633 ¶13. Despite the existence of newer DTI, customers often continue to use older DTIs, including under extended support programs, until they no longer are functional. 4-ER-0558–59 ¶5; 4-ER-0625 ¶11; 4-ER-0652–53 at 62:22-63:20. When customers finally replace an obsolete DTI with a new DTI, they often prefer that the new DTI has the same capabilities and functionalities as the obsolete DTI. 17-ER-3797–98 ¶¶77, 82, 17-ER-3817 ¶¶130-131, 17-ER-3821–30 ¶¶139-165, 17-ER-3832–33 ¶¶170-173. Thus, Teradyne ensured that its newer test instruments can provide backwards compatibility and that its current Di-Series DTI is compatible with test programs written for the M9-Series DTI and L-Series Tester. 4-ER-0623 ¶6; 4-ER-0631–33 ¶¶5-13.

When developing its M9-Series, Teradyne employees wrote various software programs to run on and with these products to provide backwards

6

compatibility, including the sixteen copyrighted works at issue in this case (the "Teradyne Works"), all of which have been registered with the U.S. Copyright Office. 4-ER-0570–71 ¶27; 2-ER-0269–89; 2-ER-0290–307; 2-ER-0226–29; 2-ER-0230–33; 2-ER-0086–136. Teradyne invested significant time and money in the development of these works. Teradyne employees had to make myriad decisions about this source code and its structure, sequence, and organization, including what functions to include in the code, how to describe and identify these functions, what parameters each function would take, and what messages to provide to customers when errors occurred. *See* 4-ER-0598–99; 4-ER-0636–38 ¶¶25-32; 20-ER-4742–48 ¶¶6-31; 20-ER-4754–58 ¶¶22-39. The resulting Teradyne Works control how a customer interacts with a given software program or hardware device, and allow customers to create, execute, and run computer programs called test program sets ("TPSs") on Teradyne equipment. 4-ER-0559 ¶6; 4-ER-0631–32 ¶¶4-7. These works comprise four groups: the M9-Series Works, the CShell Works, the DTB Works, and the Diagnostics Works. 4-ER-0631–32 ¶¶5-8; 5-ER-0794 at 50:13-24; 6-ER-1001-02 at 30:4-31:15; ER-1238–1247 ¶¶43-61; 7-ER-1268–358 ¶¶111-254; 14-ER-3150–58 ¶¶105-123.

In brief, the M9-Series Works[1] provide a library of functions to allow customers to write programs and run them on Teradyne's M9-Series and Di-Series products. 4-ER-0631 ¶5. The CShell Works[2] help convert TPSs written for Teradyne's earlier L-Series Tester so they can run on Teradyne's later M9-Series and Di-Series products. 4-ER-0631–32 ¶6. The DTB Works[3] allow Teradyne's M9-Series and Di-Series products to create and execute programs written in a proprietary Teradyne file format, Digital Test Binary. 4-ER-0632 ¶7. And the Diagnostics Works[4] enable Teradyne's M9-Series and Di-Series DTIs to provide fault detection and diagnosis support for customer unit testing by Teradyne's M9-Series and Di-Series products. 4-ER-0632 ¶8.

In 2012, Teradyne announced that the M9-Series DTI soon would be discontinued. 4-ER-0623 ¶6; 7-ER-1249 ¶68; 17-ER-3790 ¶50. Teradyne informed its customers—including its government customers which relied on Teradyne's M9-Series DTI in many of their test systems—that it would continue to

---

[1] The M9-Series Works consist of Teradyne's M9-Series Driver API 2.3, M9-Series Driver API 3.1, M9-Series Driver 2.3 Dynamic Link Library, and M9-Series Driver 3.1 Dynamic Link Library Works. 4-ER-0631 ¶5; 20-ER-4719–20; 20-ER-4751 ¶5.
[2] The C-Shell Works consist of Teradyne's CShell API 1.0, CShell API 3.3, CShell 1.0 Dynamic Link Library, and CShell 3.3 Dynamic Link Library Works. 4-ER-0631–32 ¶6; 20-ER-4720; 20-ER-4751 ¶6.
[3] The DTB Works consist of Teradyne's DTB API 1.0.0.1 File Version 2, DTB 1.0.0.1 File Version 2 Dynamic Link Library, DTB API 1.0.0.1 File Version 18, and DTB 1.0.0.1 File Version 18 Dynamic Link Library Works. 4-ER-0632 ¶7; 20-ER-4720; 20-ER-4751–52 ¶7.
[4] The Diagnostics Works consist of Teradyne's M9-Series Diagnostics v1.1 API, M9-Series Diagnostics v2.0 API, CSi Diagnostics v6.0 API, and CSi Diagnostics v7.0 Dynamic Link Library Works. 4-ER-0632 ¶8; 20-ER-4720; 20-ER-4752 ¶8.

8

support the M9-Series DTI (which it still does for certain customers to this day). 4-ER-0623 ¶6; 17-ER-3789–90 ¶¶48, 50-52. Teradyne also offered its Di-Series DTI as a suitable replacement because of its ability to seamlessly run programs designed for both Teradyne's earlier L-Series Tester and M9-Series products. 4-ER-0582–83 ¶¶49, 51; 4-ER-0623 ¶6; 4-ER-0631–33 ¶¶6, 10-11, 13; 7-ER-1249–50 ¶¶67-69; 18-ER-4072–73 ¶¶161-162.

With this announcement, ATS saw an opportunity to compete with Teradyne for the replacement of the M9-Series DTI. ATS developed its own competing DTI, the T940. *See* 4-ER-0557 ¶1; 4-ER-0564–65 ¶¶14-16; 2-ER-0253–256 ¶¶ 12, 18, 20; 19-ER-4388–4407; 2-ER-0079 ("The T940 hardware uses LDE and DFL to emulate Teradyne's legacy products.")); 5-ER-0706–708 at 60:21-61:15, 62:2-21; 5-ER-0717 at 77:4-15; 5-ER-0835 at 285:5-15; 7-ER-1250–1252 ¶¶ 72-73, 76; 18-ER-4066–67 ¶¶ 144–145; 19-ER-4370–74 at 46:19-47:3, 49:4-21, 53:20–54:8; 19-ER-4378 at 77:4-15; 19-ER-4326–27 at 28:18-29:9; 19-ER-4359–60 at 196:25-197:7. To compete with Teradyne in replacing discontinued M9-Series products, ATS wanted to offer backwards compatibility with Teradyne's instruments, so customers could seamlessly run their older programs written for Teradyne's L-Series Tester and M9-Series DTI. 17-ER-3818–30 ¶¶132-165; 17-ER-3834–53 ¶¶174-226. To do this, ATS created its Legacy Digital Emulation ("LDE") and Digital Functional Library ("DFL") software, offering them as options with its

T940 products. 4-ER-0564 ¶14; 7-ER-1250–1251 ¶72; 18-ER-4066–67 ¶¶144-145; 19-ER-4359–60 at 196:25–197:7; 19-ER-4370–4371 at 46:19-47:3; 19-ER-4373–74 at 53:20-54:8.

Yet instead of devoting the time, effort, expense, and creativity necessary to create this software from scratch—as Teradyne did with its own software—and despite the various non-infringing alternatives it had to make its products compatible with test programs written for earlier Teradyne equipment, ATS took a shortcut, choosing to free-ride on Teradyne's own creative authorship, by simply copying portions of the Teradyne Works into ATS's directly competing products: the LDE and DFL software included in ATS's T940 DTI. 6-ER-1085 (admitting to copying at least "Compatibility Code (i.e., declaring code, aliasing code, and error code/messages) to develop its innovative [Legacy Digital Emulation and Digital Functional Library software]."); *see also* 7-ER-1268–316 ¶¶111-188 (M9-Series Works), 7-ER-1318–39 ¶¶194-224 (CShell Works), 7-ER-1343–47 ¶¶ 230-36 (DTB Works), 7-ER-1350–61 ¶¶243-260 (Diagnostics Works); 5-ER-0702 at 53:6-9; 5-ER-0706 at 60:18-20 (confirming LDE and DFL are never provided separately from the T940 DTI). In fact, ATS's own employees and expert have admitted that it copied portions of the Teradyne Works, including entire Teradyne source code files, into ATS's LDE and DFL software. 4-ER-0613; 14-ER-3123–24 ¶¶53-54; 5-ER-0907–08 at 82:17-83:17, 5-ER-0912–13 at 92:8-93:4, 5-ER-

0923 at 108:22-25; 5-ER-0741–42 at 142:20-143:9; 5-ER-0749 at 150:8-11; 5-ER-0861–62 at 87:20-88:8; 5-ER-0864 at 90:5-15; 5-ER-0881 at 123:8-21. These Teradyne source code files, and other portions of code from the Teradyne Works, are present in certain of ATS's T940 DTI, and include not only those lines of code that arguably allow backwards compatibility, but also various other Teradyne files, non-functional comments, error codes, and even Teradyne's own copyright notices. 4-ER-0613 (citing 14-ER-3123–24 ¶¶53-54; 7-ER-1233 ¶28, 7-ER-1280–82 ¶¶126-127, 7-ER-1311–12 ¶¶179-180, 7-ER-1325–26 ¶¶202-203, 7-ER-1338 ¶223).

ATS's unauthorized copying allowed it to offer its T940 DTI with LDE and/or DFL software to customers, including government agencies, seeking to replace Teradyne's older products with a solution that could run programs written for Teradyne's M9-Series DTI and L-Series Testers. *See*, *e.g.*, 4-ER-0564–65 ¶¶14-16; 2-ER-0079; 5-ER-0706–08 at 60:21-61:15, 62:2-21; 5-ER-0717 at 77:4-15; 5-ER-0835 at 285:5-15; 7-ER-1250–52 ¶¶72-73, 76; 18-ER-4066–67 ¶¶144–145; 19-ER-4326–27 at 28:18-29:9. ATS's copying forced Teradyne to compete with its own intellectual property, and offer greater discounts and lower the price of its own Di-Series DTI. 17-ER-3805–53 ¶¶107-226. This caused direct financial harm to Teradyne in two ways. First, for the contracts Teradyne won, it lost profits in the form of price erosion. 17-ER-3853–81 ¶¶227-324. Second, for the contracts

11

Teradyne lost to ATS, it suffered lost profits associated with those lost sales. 17-ER-3881–91 ¶¶325-369.

ATS claimed that its widespread unauthorized incorporation of the Teradyne Works into its own directly competing products should be deemed permissible fair use. After the close of discovery, and prior to trial, ATS moved for summary judgment on this basis. Despite Teradyne identifying several genuine disputes of material fact concerning each of the fair use factors, the district court granted summary judgment in favor of ATS, finding that all of its copying from each of the Teradyne Works was fair use. 1-ER-0004.

In doing so, as discussed in detail below, the district court not only ignored some genuine issues of material fact, but also made determinations of fact that should have been reserved for the jury.

Because the district court's decision usurped the role of the jury in deciding these factual issues, Teradyne respectfully submits that the district court's grant of summary judgment should be reversed, and the case remanded for trial.

## SUMMARY OF THE ARGUMENT

To prevail on the affirmative defense of fair use at the summary judgment stage, a defendant must "show that 'the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" *Shakur*, 514 F.3d at 890 (citation omitted); *see also Narell v. Freeman*, 872 F.2d 907, 910 (9th Cir. 1989) ("[f]air use is a

mixed question of law and fact that may be resolved on summary judgment if a reasonable trier of fact could reach *only one conclusion*" (emphasis added) (citation omitted)). Here, in determining that ATS overcame that significant burden, the district court erred by both (i) ignoring some material factual disputes and (ii) resolving others in ATS's favor, despite Teradyne's contrary evidence.

The district court's error affected its analysis on each of the four key factors of the fair use test: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107.

The first factor—the purpose and character of the use—considers whether a defendant's use of the work at issue is commercial and transformative. As the district court acknowledged, there is no dispute that ATS's use is commercial, which weighs against fair use. As for transformativeness, the Supreme Court recently affirmed in *Warhol* that "the fair use doctrine has always precluded a use that 'supersedes the use of the original.'" *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 550 (1985) (citation omitted). Here, ATS used Teradyne's copyrighted works to directly compete with Teradyne for the same customers in the same market, leading the district court to confirm that its use was not "highly transformative." 1-ER-0037. But the district court nonetheless

13

improperly determined that this factor was "in equipoise, with just a slight lean towards fair use," finding ATS's use to be "perhaps somewhat transformative, but seemingly less than moderately transformative." 1-ER-0038–39. In reaching this conclusion, the district court relied on cases where—unlike here—the uses at issue were on new or distinct platforms and did not directly compete with the copyrighted works. Moreover, the district court improperly resolved disputed issues of fact, ignoring the evidence that the infringing ATS products substituted for Teradyne's products in the marketplace, and therefore cannot be transformative. These factual disputes were for the jury, not the judge, to decide.

The second fair use factor—the nature of the copyrighted work—requires, among other things, a determination of whether copying was "necessary" to achieve the allegedly fair use. *See Sony Comput. Ent.*, 203 F.3d at 603 ("[Defendant's] copying of the [copyrighted work] must have been 'necessary' to have been fair use"); *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1526 (9th Cir. 1992). Teradyne and its expert raised several material factual disputes as to whether ATS's copying was "necessary," none of which was addressed or even acknowledged by the district court's opinion. Teradyne also presented evidence of its substantial investment in the creation of its copyrighted works, which this Court considers as part of the factor two analysis. *See Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dep't*, 447 F.3d 769, 780 (9th Cir. 2006) ("[Plaintiff] presented

14

undisputed evidence that [the copyrighted] software products were developed over several years, and required a multi-million dollar investment on [plaintiff's] part. We therefore conclude that the nature of the copyrighted work weighs against a finding of fair use."). Yet, the district court neglected or ignored this evidence in its analysis. A proper fair use analysis requires that these disputes be presented to and resolved by a jury.

On the third fair use factor—the amount and substantiality of the work used by the defendant, in relation to the copyrighted work as a whole—the district court acknowledged that "there is perhaps still room for further discussion on this factor," 1-ER-0044, yet nevertheless determined that it "appears to clearly favor a fair use finding." The district court's analysis on this issue was flawed because, among other reasons, it treated *sixteen different, distinct copyrighted Teradyne works* as essentially a single work, without considering the quantitative amount and qualitative importance of the portions of each work copied by ATS.

For example, the district court never made a single finding as to (1) how much code ATS copied from any of the sixteen Teradyne works individually (despite Teradyne's evidence that ATS copied very substantial portions of certain works, including *the entirety* of the M9-Series Diagnostics v1.1 API), or (2) the qualitative importance or significance of the copied code. At a minimum, there are factual disputes that the jury needs to resolve about the amount and substantiality

15

of each work used, from both a quantitative and a qualitative sense. Without citation to the evidentiary record, the district court also improperly found ATS's copying to be "*de minimis*, at most." 1-ER-0043 n.23. But whether in copying even error codes, comments, and *Teradyne's own copyright notices*, ATS copied more than necessary to achieve its stated purpose of "compatibility"—was an issue for the jury to decide after hearing the parties' competing documentary, fact, and expert evidence.

Finally, on the fourth factor—harm to the value of the copyrighted works or the effect on the markets in which those works are or could be sold—the district court erred by effectively placing the burden on the non-movant, *Teradyne*, to define the relevant market(s) and to show harm. This Court's precedent, which "unequivocally place[s] the burden of proof on the proponent of the affirmative defense of fair use," *Dr. Seuss Enterprises, L.P. v. ComicMix LLC*, 983 F.3d 443, 459 (9th Cir. 2020), mandates that ATS needed to affirmatively present evidence to define the market and to show a lack of harm to the value of Teradyne's Works. ATS did not even attempt to meet that burden. Moreover, the district court incorrectly treated the definition of the relevant market for factor four as a legal issue, even though it is a quintessential jury question. *See, e.g.*, *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1206 (2021); *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1379 (Fed. Cir. 2003).

Remarkably, the district court ignored Teradyne's evidence of factor four harm, including harm to the value of the copyrighted works caused by ATS's copying of Teradyne's source code to enable its T940 DTI to compete directly against Teradyne's own products containing the copyrighted works. Moreover, the district court improperly resolved disputed issues of material fact against Teradyne, including the alleged public benefits from ATS's copying and whether those alleged benefits could have been achieved by alternative means. Indeed, Teradyne introduced evidence showing that ATS's claims that its copying served the public interest (because of the risk that incompatible equipment would malfunction) were specious, as the military and defense industry employ various robust safeguards to prevent such mishaps—and that moreover, ATS could have achieved interoperability through other, non-infringing means, such as a software wrapper or translator. At a minimum, the jury needed to resolve those disputes of fact, as well as factual questions about the relevant actual and potential markets at issue; the nature and effect of the competition between Teradyne and ATS; and the nature and extent of the harm that ATS's copying inflicted on the value of the copyrighted works and the markets in which those works are or could be sold.

Teradyne respectfully submits that these factual disputes on the fair use factors—considered collectively or individually—require reversal of the district

17

court's grant of summary judgment to ATS, and remand so that these factual issues can be properly adjudicated at trial.

## ARGUMENT

### I. STANDARD OF REVIEW AND RELEVANT LAW

Grants of summary judgment are reviewed *de novo*. *Scheuring v. Traylor Bros.*, 476 F.3d 781, 784 (9th Cir. 2007). Summary judgment is appropriate only when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In reviewing a grant of summary judgment, the Ninth Circuit "must determine, viewing the evidence in the light most favorable to the nonmoving party, whether genuine issues of material fact exist and whether the district court correctly applied the relevant substantive law." *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 822 (9th Cir. 2011) (citation omitted).

Fair use, an affirmative defense to a claim of copyright infringement that applies to "purposes such as criticism, comment, news reporting, teaching . . . scholarship, or research," considers four key, non-exclusive factors: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107. Fair use is a mixed question of law and fact. *Google*, 141

18

S. Ct. at 1197-98 (alteration in original) (quoting *Harper & Row*, 471 U.S. at 560). "[T]he ultimate 'fair use' question primarily involves legal work," although this may "involve determination of subsidiary factual questions, such as 'whether there was harm to the actual or potential markets for the copyrighted work' or 'how much of the copyrighted work was copied.'" *Id.* at 1199-1200 (citations omitted) (sanctioning the Federal Circuit's approach in "leaving factual determinations to the jury").

To meet both burdens noted above and prevail on a motion for summary judgment on the affirmative defense of fair use, the defendant "must establish 'beyond controversy every essential element.'" *Marvix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1052 (9th Cir. 2017) (citation omitted). The evidence must be "so powerful that no reasonable jury would be free to disbelieve it," *Shakur*, 514 F.3d at 890—otherwise, summary judgment in favor of the defendant is inappropriate.

## II. FACTOR ONE—IN DETERMINING THAT FACTOR ONE FAVORED FAIR USE, THE DISTRICT COURT IGNORED GENUINE ISSUES OF MATERIAL FACT REGARDING "TRANSFORMATIVENESS"

As the Supreme Court recently recognized in *Andy Warhol Foundation Visual Arts, Inc. v. Goldsmith*, the "central question" in the first factor of the fair use analysis—the purpose and character of the use—is "whether the new work merely 'supersede[s] the objects' of the original creation . . . ('supplanting' the

19

original), or instead adds something new, with a further purpose or different character." 598 U.S. 508, 528 (2023) (quoting *Campbell*, 510 U.S. at 579). This inquiry is driven by whether the infringer's use competes in the same market as the original work. *See id.* at 524-25.

The Supreme Court further explained that degree of difference between the copyrighted work's use and the alleged fair use must be balanced against the commercial nature of the alleged fair use. "If an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use." *Id.* at 532-33. The commercial nature of the use is not dispositive, but it is relevant. "[T]he more transformative the new work"—*i.e.*, the more it is used for a different purpose or has a different character than the copyrighted work—"the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579.

Here, the district court acknowledged that ATS's use of the Teradyne Works was "indisputably commercial," 1-ER-0038 ("There is no question that Astronics stood to profit from its use of Teradyne's code"), which weighs against a finding of fair use. Yet instead of allowing the jury to resolve multiple factual disputes concerning whether ATS's use also was "transformative," the district court improperly resolved those disputes on summary judgment.

20

### A. The District Court Improperly Ignored Teradyne's Evidence That ATS's Use "Supersedes" and Replaces Teradyne's Copyrighted Works in the Market

"[T]he fair use doctrine has always precluded a use that 'supersede[s] the use of the original.'" *Harper & Row*, 471 U.S. at 550 (citation omitted). The Supreme Court recently clarified that this test focuses on whether the infringing work competes directly with the copyrighted work. *Warhol*, 598 U.S. at 524-25. For example, in *Warhol*, the Court noted that Andy Warhol's famous paintings of Campbell's soup can labels did not directly compete with Campbell's own use of those copyrighted logos because "the Soup Can series uses Campbell's copyrighted work for an artistic commentary on consumerism, *a purpose that is orthogonal to advertising soup*." *Id.* at 539 (emphasis added); *see also* 17 U.S.C. § 107 ("for purposes such as criticism, comment, news reporting, teaching . . . scholarship, or research").

In contrast, the Court found the opposite was true for the copyright infringement at issue before the Court—Warhol licensed his painting of a photograph of Prince as a magazine illustration, just as that photograph's creator, plaintiff Goldsmith, licensed the photograph as a magazine illustration. *Id.* at 519-20. The Supreme Court explained that, in such a situation, the infringing use was not transformative because "the original photograph and [defendant's] copying use of it share substantially the same purpose" and "[defendant's] commercial

licensing encroached on [plaintiff's] protected market to license her photograph." *Id.* at 524-25.

Here, the parties agree that they sell competing products to many of the same customers—Teradyne sells its Di-Series DTI product, ATS sells its T940 product, and customers generally choose one or the other. 4-ER-0557 ¶1; 2-ER-0253–55 ¶¶12, 18; 19-ER-4388–407; 4-ER-0582–83 ¶¶50-51; 7-ER-1249–50 ¶¶68–69; 18-ER-4072–73 ¶¶161–162; 4-ER-0623 ¶6; 4-ER-0633 ¶13; 4-ER-0562 ¶10; 2-ER-0255, ¶18; 7-ER-1250–51 ¶ 72; 18-ER-4063–64 ¶¶138–139. Teradyne presented evidence that ATS copied the Teradyne Works (software incorporated into Teradyne's test instruments) into its competing T940 product, including "various files in their entireties" and other "critical functions," reaching far beyond what was "necessary" to achieve ATS's supposed goal of "inter-vendor compatibility." 4-ER-0613 (citing 14-ER-3123–24 ¶¶53-54; 7-ER-1233 ¶28, 7-ER-1280–82 ¶¶126-127; 7-ER-1311–12 ¶¶179-180; 7-ER-1325–26 ¶¶202-203; 7-ER-1338 ¶223). While (as discussed below), the parties dispute *how much* Teradyne code was copied, there is no dispute that ATS copied at least some of the code from the Teradyne Works—ATS admitted as such in briefing on other summary judgment motions in the district court. 6-ER-1085 ("Instead, it copied only approximately 1,000 lines of Compatibility Code."). And Teradyne presented fact and expert evidence showing a loss of sales as a result of ATS's copying—a

22

quintessential confirmation that ATS's use of Teradyne's code was a "superseding use." 17-ER-3853–91 ¶¶227-369; 2-ER-0058–61; *see also Warhol*, 598 U.S. at 535-36.

In fact, the district court itself stated that it "was initially convinced that Astronics' conduct was not transformative at all, but simply a clear market substitute." 1-ER-0035. However, despite Teradyne's evidence on the issue, and despite the district court's obligation to "view the facts in the light most favorable to the non-moving party and draw reasonable inferences in favor of that party" in deciding summary judgment, *Scheuring*, 476 F.3d at 784, it nevertheless resolved this factual dispute in favor of ATS.

At a minimum, the jury should be presented with evidence and given the opportunity to decide the factual issues underlying the transformativeness question—*i.e.*, to decide whether ATS's use of the copyrighted works merely supersedes Teradyne's works—as Teradyne's evidence shows—or if it truly adds something new or created some new expression, meaning, or message. *Campbell*, 510 U.S. at 579; *Cf. In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268, 1274 (9th Cir. 2013) (noting that in right of publicity claims the application of the "transformative use" defense is a question of fact). Indeed, although the Supreme Court in *Google* noted that the ultimate question of fair use is a legal one for the court to decide, its analysis of the question of

23

transformativeness heavily cited to and relied on the evidence presented to the jury. *Google*, 141 S. Ct. at 1202-04. Teradyne's evidence here likewise should be presented to the jury.

> **B.** **Because ATS's Use Was Not Intermediate or on a New Platform, *Sony, Sega*, and *Google-Oracle* Do Not Support the District Court's Factor One Conclusion**

In analyzing and deciding this factor, the district court addressed *Sega* and *Sony*, two cases involving a defendant's *intermediate* copying of a plaintiff's copyrighted works to create compatibility with—not a substitute for—the plaintiff's product. The district court also considered the Supreme Court's decision in *Google v. Oracle*—which, like the present case, involved the copying of APIs. Each of those cases involved a situation where, unlike here, the copyrighted material was being used by defendant to create a *new platform different than plaintiff's platform*. Indeed, the district court correctly contrasted both *Sega*[5] and *Google*[6] from ATS's conduct at issue here. 1-ER-0037 (noting that "Astronics' actions fall short of what occurred in *Google*"), 33 n.20 (distinguishing *Sega*).

---

[5] In *Sega*, defendant did not create a substitute for Sega's Genesis video gaming console, but instead used the copyrighted material to make its own, original video games to be played on the Sega Genesis consoles. 977 F.2d at 1514-16.
[6] In *Google*, defendant did not create a substitute for the Java programming platform used for desktop computers, but instead used the copyrighted Java APIs to create "a new platform"—the now-ubiquitous Android smartphone operating system. *See* 141 S. Ct. at 1203, 1207.

But the district court heavily relied on and had "a difficult time distinguishing this case" from this Court's decision in *Sony Computer Entm't v. Connectix Corp.*, 203 F.3d 596, 603 (9th Cir. 2000). 1-ER-0037.

As explained below, the district court misread and misapplied *Sony*. For example, the district court stated that "[r]ather than creating a new environment that would attract programmers to write and design an untold and unlimited number of new applications," defendant in *Sony* "simply created a way to play games designed for the plaintiff's gaming hardware on a personal computer instead" and "effectively swapped the defendant's product for the plaintiff's." 1-ER-0037. Not so. In *Sony*, this Court deemed the defendant's use of the copied material to be "moderately transformative" because it "create[d] a new platform, the personal computer, on which consumers can play games designed for the Sony PlayStation," and therefore "does not merely supplant the PlayStation console." *Sony*, 203 F.3d at 606-07. Defendant there was *not* making a directly competing hardware product—it made a software product called "Virtual Game Station" that allowed a personal computer to emulate—*i.e.*, act like—Sony's PlayStation Game Console, allowing those personal computers to play Sony PlayStation-compatible games. *Id.* at 598. As this Court explained, while Sony might suffer *some* economic loss as a result of personal computer users purchasing the Virtual Game Station to play PlayStation-compatible games, the Virtual Game Station did not

25

"merely supplant"—*i.e.*, directly swap out for—the PlayStation console. *Id.* at 607.

Here, ATS's use of Teradyne's software did not create a "new platform," but instead was incorporated into a product that directly competes with, and replaces, Teradyne's products including that software. 4-ER-0614–15; 4-ER-0674–75 at 298:22-299:1; 5-ER-0702 at 53:2-9; 5-ER-0706 at 60:18-20; 17-ER-3853–91 ¶¶227-369; 16-ER-3638–83 at 32-77. Indeed, Teradyne's Di-Series DTI and ATS's T940 product are digital test instruments used in larger test systems that include other test instruments. 4-ER-0622–23 ¶¶5-6, 4-ER-0625 ¶12; 17-ER-3790–98 ¶¶53-82. Customers typically choose either Teradyne's Di-Series DTI or ATS's T940 product for a system's digital test instrument(s), and those products directly compete for the same spot in the system. 17-ER-3790–98 ¶¶53-82. When ATS markets the infringing T940 product over the Di-Series DTI, it does not transform the test system into a "new platform"—rather, it merely offers its competing product as a substitute for Teradyne's original.

And perhaps even more importantly, unlike the T940 products running ATS's LDE and DFL software here, the Virtual Game Station at issue in *Sony* did not contain any of Sony's copyrighted material. *Sony*, 203 F.3d at 598, 600. Instead, defendant's copying was merely "intermediate," for purposes of reverse engineering the functionality of the PlayStation. *Id.* at 603-04. The intermediate

26

nature of this copying was emphasized throughout this Court's opinion and was critical to this Court's analysis of fair use factors one and two—which in turn drove the analysis for factor four. *Id.* at 603-04; *see also id.* at 607 ("Connectix's commercial use of the copyrighted material was an intermediate one, and thus was only 'indirect or derivative.'") (citation omitted).

If the defendant in *Sony* had, for example, created another game *console* called "Connectix GameStation" that copied Sony's software to create software running on Connectix GameStation and directly competed with and "merely supplant[ed] the Sony PlayStation console," that use would not have been transformative or "fair." *See Sony*, 203 F.3d at 607. Yet that is essentially what ATS did here, *see* 4-ER-0607–10, where ATS's copying was not merely "intermediate" or for purposes of reverse engineering. 4-ER-0613 (citing 14-ER-3123–24 ¶¶53-54; 7-ER-1233 ¶28; 7-ER-1280–82 ¶¶126-127; 7-ER-1311–12 ¶¶179-180; 7-ER-1325–26 ¶¶202-203; 7-ER-1338 ¶223). Instead, Teradyne's own copyrighted code is present in ATS's final products—forcing Teradyne to compete against its own copyrighted code. *Id.*; *see also* 5-ER-0907–08 at 82:17-83:17; 5-ER-0912–13 at 92:8-93:4; 5-ER-0923 at 108:22-25; 5-ER-0741–42 at 142:20-143:9; 5-ER-0749 at 150:8-11; 5-ER-0861–62 at 87:20-88:8; 5-ER-0864 at 90:5-15; 5-ER-0881 at 123:8-21.

The district court even acknowledged that "perhaps this distinction is reason to conclude that the use here – which fairly clearly did include Teradyne's code in Astronics' end-product – is somewhat less transformative than what was deemed 'modestly transformative' in *Sony Computer*."  1-ER-0038.  However, the district court stated that it could not "outright reject Astronics' argued connection between compatibility and transformativeness in the realm of computer programs," and as such, concluded that "[i]f the use in *Sony Computer* was transformative, the Court feels compelled to conclude that Astronics' use here was too."  1-ER-0038.  This resolution of a clearly disputed factual issue—whether ATS's use supersedes (*i.e.*, merely substitutes for) the Teradyne Works—was improper and should have foreclosed summary judgment.

### III.  FACTOR TWO—THE DISTRICT COURT FAILED TO MAKE THE APPROPRIATE INQUIRY UNDER THIS COURT'S PRECEDENT, AND MATERIAL FACT DISPUTES REMAIN

Factor two involves an assessment of the "nature of the work."  The district court correctly acknowledged that this factor "has not been considerably influential" in the fair use analysis (1-ER-0040), but nonetheless concluded that it weighed in favor of finding fair use.  In doing so, the district court both ignored binding precedent from this Court and ignored genuine disputes of material fact.

## A.    The District Court Failed to Consider or Evaluate Whether ATS's Copying Was Necessary to Achieve Its Purported Purpose of "Compatibility"

In *Sony*, this Court explained that, to find fair use, the defendant's intermediate copying of the copyrighted material at issue must have been "necessary." *Sony*, 203 F.3d at 603 (noting that "[Defendant's] copying of the [copyrighted work] must have been 'necessary' to have been fair use," and concluding in its factor two analysis that "Connectix's copying of the Sony BIOS [was] 'necessary'"). And in *Sega*, this Court determined that the evidence showed that the otherwise infringing conduct—intermediate "disassembly of the object code in Sega's video game cartridges"—was necessary in order to understand the functional requirements for Sega Genesis compatibility, and therefore supported fair use. *Sega*, 977 F.2d at 1526.

Here, however, the district court made no such findings concerning the necessity of ATS's copying of Teradyne's code into ATS's digital test instruments. Indeed, ignoring binding precedent in *Sony* and *Sega*, the district court looked to authority from another circuit to hold that "the law does not require that the secondary artist may take no more than is necessary." 1-ER-0043 n.23 (quoting *Cariou v. Prince*, 714 F.3d 694, 710 (2d Cir. 2013)).

The question of whether ATS's copying was "necessary" to achieve ATS's stated goal of compatibility is an issue of material fact relevant to the applicability

of its fair use defense, was disputed by the parties and their experts, and should be presented to the jury. Teradyne produced fact and expert testimony demonstrating that ATS had alternatives to copying that would have enabled compatibility with legacy programs, and that ATS's extensive copying was not "necessary" to achieve that goal. 4-ER-0609 (citing 7-ER-1378–81 ¶¶305-10); *see also, e.g.*, 19-ER-4458 at 151:6-19; 5-ER-0714 at 70:8-21. These options—which would have required less copying, or no copying, of the Teradyne Works—included writing new programs (see 7-ER-1379 ¶306), manually translating customer programs (*id.*), ATS writing a software program to convert customer programs (see 7-ER-1379–80 ¶307), and writing a software "wrapper" to provide an interface between customer programs and ATS's digital test instruments (see 7-ER-1368 ¶279; 7-ER-1380 ¶308).

Teradyne's technical expert, Mr. Baer, is prepared to testify at trial that the vast majority of ATS's copying was unnecessary to achieve compatibility with legacy programs. Such examples of unnecessary copying include: (1) ATS's copying of function declarations in ATS's declaring code, (2) ATS's copying of function names and parameter names in its implementation code, (3) ATS's copying of error codes and the corresponding constants and error messages, (4) ATS's copying of comments, including Teradyne's copyright notices, and (5) ATS's copying of "define" statements. *E.g.*, 4-ER-0478–79; 4-ER-0510–12 ¶¶45,

30

47-49; 4-ER-0516–19 ¶¶61-67; 4-ER-0521 ¶71; 7-ER-1293–94 ¶¶156-158; 7-ER-1320–28 ¶¶197-207; 7-ER-1329–34 ¶¶211-216; 7-ER-1337–39 ¶¶221-224; 7-ER-1354–55 ¶¶249-250; 8-ER-1686–9-ER-1864; 12-ER-2729–805; 12-ER-2806–22, 12-ER-2823–36; 12-ER-2837–41; 12-ER-2845–74; 12-ER-2885–907; 12-ER-2908–13; 13-ER-2994–97; 13-ER-3062–78; 19-ER-4478–85; 2-ER-0137–51; 19-ER-4543-49 at lns. 10-473; 19-ER-4549–56 at lns. 482-945; 19-ER-4557–59; 19-ER-4445 at 112:19-25; 19-ER-4452–54 at 134:22-136:3, 134:22-136:25; 19-ER-4464–65 at 185:16-186:21; 5-ER-0868–70 at 101:1-103:10; 5-ER-0874–78 at 111:9-114:3, 114:22-115:10; 18-ER-4188–89 ¶391; 18-ER-4270–71 ¶498; 19-ER-4408–15; 19-ER-4492–93 ¶239; 19-ER-4494–541.

This evidence was ignored by the district court, and the material factual disputes on the necessity of copying remain unresolved in the context of factor two.[7]  ATS's fair use arguments fail if its copying was not "necessary," such that compatibility was achievable with no copying or less copying. *See Sony*, 203 F.3d at 603 (finding in the context of factor two that defendant's copying must have been "necessary" to have been fair use); *Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 758 (9th Cir. 1978) ("[w]hile other factors in the fair use calculus may

---

[7] Without citing any of the evidence presented by Teradyne, the district court stated that it "would conclude that any excess/unnecessary copying here was *de minimis*, at most," 1-ER-0043 n.23, but it did so in the context of factor three, not factor two.

not be sufficient by themselves to preclude the fair use defense, . . . excessive copying precludes fair use"). Thus, the district court erred in failing to address these factual disputes, requiring remand.

**B.     The District Court Failed to Consider or Evaluate Teradyne's Investments in Its Copyrighted Software Works**

In *Wall Data*, this Court recognized that a copyright owner's substantial investment of time and labor is relevant to the second fair use factor and supports a finding of no fair use. 447 F.3d at 780. The Court there held that though the software works at issue were "not purely creative," they were nonetheless protected by copyright, and plaintiff's multi-million-dollar investment in that software weighed against a finding of fair use. *Id.*

Here, Teradyne presented evidence concerning the substantiality of its investments in its copyrighted software. *See, e.g.*, 6-ER-0976–77 at 34:8-35:2 ("Teradyne has gone to great lengths and expense to make sure that many generations of products' same test program can run on a new platform."). Teradyne created the works asserted in this case over many years. *See, e.g.*, 4-ER-0632–33 ¶11 (describing work on M9-Series Works beginning in 1996 and publishing the M9-Series Driver 2.3 DLL and M9-Series Driver API 2.3 in 1998); 2-ER-0086–136 (showing publication of Teradyne Works over the course of years). Teradyne's software engineers, including Teresa Lopes and David Lind, described the myriad creative decisions and the iterative process used to create the

Teradyne Works. *E.g.*, 4-ER-0636–39 ¶¶26-38; 20-ER-4743–48 ¶¶9-31. However, the district court did not consider this evidence in its analysis, and its only citation in its decision to *Wall Data* was unrelated to this issue. Its failure to appropriately apply this Court's case law relating to this factor is a further reason for remand.

## IV.  FACTOR THREE—THE DISTRICT COURT ERRONEOUSLY IGNORED MATERIAL FACT DISPUTES AND FAILED TO UNDERTAKE THE REQUIRED WORK-BY-WORK ANALYSIS

The third fair use factor—the amount and substantiality of the copyrighted work used by the accused infringer—necessarily requires an evaluation of defendant's copying of plaintiff's works on a work-by-work basis because the amount of each work copied, as well as the importance of the copied content to the work as a whole, may vary by work. And, as noted by the Supreme Court in *Google*, "how much of the copyrighted work was copied" is a "factual question[]." *Google*, 141 S. Ct. at 1199-1200 (citation omitted). Like all factors in the fair use analysis, and summary judgment itself, defendant bears the burden.

In finding that this factor weighed in favor of fair use, the district court ignored material disputes of fact regarding the quantity and importance of the material copied by ATS, and improperly treated the sixteen different Teradyne Works at issue as a single work. The district court compounded this error by shifting the burden on this issue to Teradyne. The district court even went so far as

33

to openly question the wisdom of allowing the jury—the factfinder—to resolve the parties' disputes on amount and substantiality of the copyrighted material copied by ATS. As explained below, these errors require reversal and remand.

### A. The Parties Dispute Material Issues of Fact Concerning the Amount and Substantiality of Copying by ATS

The upshot of the district's court's factor three analysis is that, despite removing this issue from the purview of the jury and concluding that this factor "appears to clearly favor a fair use finding" (1-ER-0044), the district court made no actual findings of fact regarding either the quantitative amount or the qualitative significance of material copied from *any* of the sixteen Teradyne Works, let alone each of them. This is clear reversible error.

The parties dispute the amount of code that ATS copied from the Teradyne Works. (1-ER-0030 n.15 (citing 4-ER-0603–04)). Teradyne presented evidence that ATS copied substantially more than either ATS admitted, or the district court assumed. *E.g.*, 4-ER-0478–79, 4-ER-0510–12 ¶¶45, 47-49, 4-ER-0516–19 ¶¶61-67; 4-ER-0521 ¶71; 12-ER-2729–805; 13-ER-2994–97; 19-ER-4478; 12-ER-2908–13; 19-ER-4543–49 at lns. 10-473; 19-ER-4549–56 at lns. 482-945; 19-ER-4557–59; 13-ER-3062–78; 20-ER-4561–637; 12-ER-2845–74; 8-ER-1686–9-ER-1864; 19-ER-4445 at 112:19-25; 19-ER-4452–54 at 134:22-136:3, 134:22-136:25; 19-ER-4464–65 at 185:16-186:21; 5-ER-0868–70 at 101:1-103:10; 5-ER-0874–78 at 111:9-114:3, 114:22-115:10; 18-ER-4188–89 ¶391; 18-ER-4270–71 ¶498; 19-

ER-4478–85; 2-ER-0137–51; 19-ER-4408–15; 19-ER-4492–93 ¶239; 19-ER-4494–41. The jury should have been allowed to evaluate Teradyne's evidence on this issue, as well as (noted above with respect to factor two) whether ATS copied more of this code than necessary for the stated purpose of interoperability. 7-ER-1233 ¶28; 7-ER-1282 ¶127; 7-ER-1311–12 ¶¶179-180; 7-ER-1325–26 ¶¶202-203; 7-ER-1338 ¶223; 14-ER-3123–24 ¶¶53-54. *See Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820-21 (9th Cir. 2003) (noting that this factor will not weigh against defendant if he or she "only copies as much as is necessary for his or her intended use"); *Toho Co. v. William Morrow & Co.*, 33 F. Supp. 2d 1206, 1217 (C.D. Cal. 1998) (factor three weighed against defendant's copying that "cannot be considered necessary" for alleged transformative purpose).

Indeed, Teradyne presented evidence showing that ATS copied *the entirety* of certain works. For example, Teradyne's copyrighted M9-Series Diagnostics v1.1 API comprises the files diagnostics.h and DM_Services.h, which ATS copied in their entirety. 14-ER-3151 ¶109; 14-ER-3182 ¶177; 4-ER-0511–12 ¶¶47-49; 19-ER-4557–59; 19-ER-4454 at 136:4-136:25; 19-ER-4465 at 185:16-186:21; 5-ER-0868–70 at 101:1-103:10; 5-ER-0874–78 at 111:9-114:3, 114:22-115:10; 18-ER-4270–71 ¶498; 19-ER-4408–15; 19-ER-4478–85; 2-ER-0137–51, 12-ER-2908–13; 19-ER-4492–93 ¶239; 19-ER-4494–541; 20-ER-4638–712. The M9-Series API Works comprise only three files—one of which, TerM9.h, ATS copied

35

in its entirety. 7-ER-1268–72 ¶¶111-117; 12-ER-2729–805; 4-ER-0510 ¶45; 19-ER-4454 at 136:4-136:25; 19-ER-4465 at 186:9-21; 5-ER-0869 at 102:2-16; 18-ER-4188–89 ¶391. At a bare minimum, this shows that the factor three analysis for these specific works tips sharply in Teradyne's favor, but the district court sidestepped that conclusion by ignoring those facts and treating all sixteen works as a single work. *See* 1-ER-0031–32, 1-ER-0042.

The parties also disputed the qualitative significance or importance of the portions of code that ATS copied. 4-ER-0613; 7-ER-1280–81 ¶126. Teradyne's fact witnesses testified that some of this copied code was particularly important to Teradyne and its products. *See, e.g.*, 5-ER-0794 at 50:13-24; 4-ER-0636–38 ¶¶25-32; 20-ER-4754–58 ¶¶22-39; 6-ER-1001 at 30:4-31:15; 20-ER-4742–48 ¶¶6-31. And Teradyne's expert Mr. Baer opined—and was prepared to explain to the jury—that the code ATS copied was critical to Teradyne's digital test instruments. In Mr. Baer's opinion, these copied portions reflected hundreds if not thousands of creative decisions about how to structure and manage the interface between Teradyne's relevant hardware and software and the customer, and as such, constituted the heart of the Teradyne Works. 7-ER-1268-58 ¶¶111-254; 14-ER-3150–58 ¶¶105-123.

**B.    Further Ignoring Teradyne's Evidence, the District Court Improperly Treated All Sixteen Teradyne Works as a Single Work—and Incorrectly Shifted the Burden to Teradyne to Provide Otherwise**

The plain language of the third fair use factor—"the amount and substantiality of the portion used in relation to <u>the copyrighted work</u> as a whole," 17 U.S.C. § 107(3) (emphasis added)—dictates that it be evaluated on a work-by-work basis. *See Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1261 (11th Cir. 2014) (citing *Cariou*, 714 F.3d at 694 ("[T]he fair use analysis is highly fact-specific and must be performed on a work-by-work basis.")).   The district court even acknowledged that "this factor, in particular, could vary depending on the copyrighted work in question" and that, by arguing about the works only collectively rather than individually, ATS took at "blunderbuss" approach to its motion.  1-ER-0042.

Recognizing that "Astronics' use of some of the works was 'more egregious' than others," 1-ER-0043, the district court still ignored the supporting evidence provided by Teradyne, and erroneously ruled on summary judgment that, despite there being "room for further discussion on this factor," factor three favored fair use, 1-ER-0044.

The district court also noted that ATS failed to include any purported undisputed facts in its Local Rule 56-1 statement as to the amount or proportion of copied code—stating that "[o]rdinarily, this would likely be considered a

37

substantial problem under applicable summary judgment procedures." 1-ER-0042 n.22. Yet instead of appropriately finding this failure to be fatal to ATS's motion, the district court placed the burden on *Teradyne*—the plaintiff and non-moving party—to explain why the outcome would be different on a work-by-work basis. 1-ER-0032 ("Teradyne has not explained why the outcome would be different on a work-by-work basis.").

This improper burden-shifting alone was reversible error. *See Dr. Seuss*, 983 F.3d at 459. And in excusing ATS's failure to comply with the local rules, which it acknowledged "[o]rdinarily" "would likely be considered a substantial problem under applicable summary judgment procedures," the court simply asked: "[d]o we need to go to a lengthy and expensive trial before a jury just to come up with a hard number/proportion that the Court – not the jury – would then consider in making its fair use determination[?]" The answer to this question is yes— because, as confirmed by the Supreme Court, it is the jury's responsibility to resolve disputed issues of fact concerning the amount and substantiality of each work ATS copied. *Google*, 141 S. Ct. at 1199-1200. The district court's statement that there is "room for further discussion on this factor" (1-ER-0044) is a tacit acknowledgment that the parties' evidence on factor three should be presented to and evaluated by the jury.

In light of the disputed material facts regarding the amount and substantiality

38

of code ATS copied from each of the Teradyne Works, Teradyne respectfully submits that this Court should reverse the decision below.

## V. FACTOR FOUR—THE DISTRICT COURT IMPROPERLY SHIFTED THE BURDEN TO TERADYNE AND RESOLVED OR IGNORED DISPUTES OF MATERIAL FACT ON HARM CAUSED BY ATS'S INFRINGEMENT

The final fair use factor—the effect of the use upon the potential market for or value of the copyrighted work—is arguably the most important, as it examines harm or injury to the copyright owner either caused or likely to be caused by the infringement. *See Harper & Row*, 471 U.S. at 566; *see also Nimmer on Copyright*, § 13F.08. As noted by the Supreme Court in *Google*, "whether there was harm" for purposes of factor four is a "factual question[]." *Google*, 141 S. Ct. at 1199-1200.

Remarkably, the district court determined that this factor "appears to fairly clearly favor a fair use finding/conclusion," despite the overwhelming evidence presented by Teradyne of (1) real-world, head-to-head competition between Teradyne and ATS; (2) ATS's acknowledgment that the purpose for its copying was to create a product that competed directly against Teradyne's copied product; (3) when customers use ATS's product with its infringing software, they stop using

39

Teradyne's product with the copyrighted software; and (4) the lost profits[8] and price erosion suffered by Teradyne due to ATS's infringement. 1-ER-0049. As described below, the district court's factor four analysis was flawed in multiple respects.

### A. The District Court Improperly Shifted the Burden to Teradyne to Show Harm

As this Court noted in *Dr. Seuss*, "the Supreme Court and our circuit have unequivocally placed the burden of proof on the proponent of the affirmative defense of fair use," who "must bring forward favorable evidence about relevant markets." 983 F.3d at 458-59 (noting that "the district court also erred in shifting the burden to [plaintiff] with respect to market harm"). Here, the district court incorrectly placed the burden not on ATS as the proponent of the fair use defense, but on Teradyne.

Despite ATS's burden on this issue, the district court did not require ATS to present any evidence showing a lack of actual or potential harm to the Teradyne Works. *Campbell*, 510 U.S. at 590 (noting that proponent of fair use defense would "have difficulty carrying the burden of demonstrating fair use" without presenting evidence). And as described in more detail below, the district court also

---

[8] Teradyne's description of "lost profits" here encompasses both (1) profits lost as a result of sales lost by Teradyne to ATS, and (2) profits lost through price erosion—*i.e.*, discounts Teradyne was forced to provide for contracts that it ultimately still won despite ATS's infringement. *E.g.*, 17-ER-3881–82 ¶327.

ignored the evidence that Teradyne presented on the harm that ATS's copying had on the value of the copyrighted works, including in the form of lost profits and price erosion. *See, e.g.*, 4-ER-0611–15; 17-ER-3853–91 ¶¶227-369; 2-ER-0061. This burden-shifting itself constitutes reversible error.

Moreover, where the infringing use is both commercial and non-transformative, as is the case here, a presumption of market harm arises. *De Fontbrune v. Wofsy*, 39 F.4th 1214 (9th Cir. 2022). Yet the district court allowed its faulty first factor analysis—where it found ATS's use "transformative," ignoring that "the fair use doctrine has always precluded a use that 'supersedes the use of the original,'" *Harper & Row*, 471 U.S. at 550 (citation omitted)—to influence the fourth factor analysis. Not only should the district court have required ATS to adduce evidence showing a lack of market harm, it should have *presumed* market harm.

## B. The District Court Improperly Defined the Relevant Market as a Matter of Law

"The fourth and final fair use factor considers 'the effect of the use upon the potential market for or value of the copyrighted work.'" *Dr. Seuss*, 983 F.3d at 458 (citing 17 U.S.C. § 107(4)) (emphasis added). Before assessing the ***effect*** on the relevant markets (*see infra* § V.C), however, any trier of fact must first define the relevant market.

41

Here, the parties presented a dispute of material fact as to the relevant market for Teradyne's copyrighted works. Teradyne's market definition focused on the real-world products that both parties offer to their customers. Specifically, Teradyne contended that the relevant market was for digital test instruments running software that allows users to execute TPSs written for Teradyne's M9 Series DTI and L-Series Testers. 4-ER-0614; 4-ER-0674–75 at 298:22-299:1; 5-ER-0702 at 53:2-9; 5-ER-0706 at 60:18-20. ATS, on the other hand, argued that the relevant market was for so-called "compatibility software," which is not separately offered for sale or sold by either party. 6-ER-1156–58.

Simply put, ATS seeks to define the relevant market as one for so-called "compatibility software"—which *neither party* offers as a stand-alone product—rather than the test instruments with built-in, pre-installed software that both parties actually sell to their customers. Indeed, the evidence shows that, rather than competing to provide mere "compatibility software," both Teradyne and ATS compete to provide DTIs running the Teradyne Works and ATS's infringing software to the same consumers. 4-ER-0557 ¶1; 2-ER-0253–55 ¶¶12, 18; 19-ER-4389–407; 4-ER-0582–83 ¶¶50-51; 7-ER-1249–51 ¶¶68–69, 72; 18-ER-4063–64 ¶¶138-139, 18-ER-4072–73 ¶¶161-162; 4-ER-0623 ¶6; 4-ER-0633 ¶13; 4-ER-0562 ¶10; 2-ER-0255 ¶18. In concocting this fictitious "compatibility software" market ATS seeks to minimize or negate the harm that ATS's unauthorized use

42

inflicts on the value of Teradyne's copyrighted software in the actual market in which it is sold.

Resolving the parties' dispute over the definition of the relevant market is a quintessential jury role, whether in copyright infringement cases or otherwise. *See, e.g.*, *Google*, 141 S. Ct. at 1199-1200, 1206 ("whether there was harm to the actual or potential markets for the copyrighted work" is a "factual question[];" "[a]s to the likely amount of loss, the jury could have found that Android did not harm the actual or potential markets for Java SE"); *May v. Sony Music Ent.*, 399 F. Supp. 3d 169, 191 (S.D.N.Y. 2019) (denying summary judgment of fair use and noting that factual questions remain concerning "the market, if any, for [plaintiff's] work"); *Ericsson*, 352 F.3d at 1379 (noting that "it was for the jury to determine" whether the plaintiff's view of the appropriate market was correct); *see also Agron, Inc. v. Lin*, No. CV0305872MMM(JWJX), 2004 WL 555377, at *8 (C.D. Cal. Mar. 16, 2004) ("Definition of the relevant market for antitrust purposes is generally a question of fact." (citing *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1489 (9th Cir. 1991))).

Yet the district court disagreed, stating that "the correct market definition would seem to be an issue for the Court to resolve, not a jury" and accepting ATS's proposed definition. 1-ER-0046. The district court's assertion that the market definition is a legal issue is an incorrect statement of the law and clear

43

ground for reversal. At minimum, the district court should have allowed the jury to decide whether ATS's infringement harmed and posed a risk of harm to the value of Teradyne's copyrighted works in the market for the parties' actual respective products—as Teradyne's evidence of lost profits and price erosion, discussed below, reflects. *See, e.g.*, 4-ER-0611–15; 17-ER-3805–91 ¶¶107-369. The district court's ruling should be reversed, and the case remanded.

### C. The District Court Improperly Resolved Factual Disputes on the Harm Caused by ATS's Infringement

The fourth fair use factor concerns "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). To evaluate the extent of market harm, this analysis "must take account not only of harm to the original but also of harm to the market for derivative works" as well as the effect of "unrestricted and widespread copying." *Campbell*, 510 U.S. at 590. This analysis must also consider whether the copying will provide any public benefits. *Google*, 141 S. Ct. at 1206. Thus, underlying this factor are subsidiary questions of fact, reserved for the jury, including the question of harm to "the actual or potential markets for the copyrighted work." *Id.* at 1199-1200, 1206.

Here, the district court disregarded Teradyne's evidence of (1) the harm to value of the copyrighted works caused by ATS's copying; (2) the harm to the actual market suffered by Teradyne as a result of ATS's infringement; (3) the harm to the potential market suffered by Teradyne, particularly in the event of

44

comparable widespread copying; and (4) the lack of public benefit from ATS's copying.

> *1.*     *The District Court Improperly Disregarded Teradyne's Evidence of Harm to the Value of and the Market for the Copyrighted Works*

In evaluating factor four, the district court agreed with ATS "that the existence of its LDE and DFL software does not appear to directly impact the market for Teradyne's copyrighted works because the LDE and DFL software does not run on Teradyne's equipment (the only equipment where Teradyne's copyrighted works have been programmed)." 1-ER-0045. In doing so, the district court improperly resolved a disputed issue of fact concerning the effect that ATS's infringing software had on the market for and the value of Teradyne's copyrighted software.

ATS's infringing software harmed the value of Teradyne's copyrighted works. ATS's argument and the district court's finding that the copyrighted software runs on Teradyne's equipment alone is beside the point. Critically, ATS's infringing software and the Teradyne Works both allow customers to run TPSs written for the M9-Series DTI and L-Series Tester. *See, e.g.*, 4-ER-0631–32 ¶¶5-8; 4-ER-0564–65 ¶¶14-16; 2-ER-0079; 5-ER-0698 at 49:4-21; 5-ER-0706–08 at 60:21-61:14, 62:13-21; 5-ER-0717 at 77:4-15; 7-ER-1250–52 ¶¶72-76; 19-ER-4326–27 at 28:18-29:9. A customer's choice to use ATS's infringing software

results in a choice not to use Teradyne's copyrighted works, diminishing their sales, their market demand, and their value.

Moreover, ATS's infringing software harmed the actual market for Teradyne's copyrighted works. Teradyne presented significant fact and expert evidence on the harm ATS's copying caused to the *actual market* in which the copyrighted works were sold to customers—digital test instruments running software that allows users to execute TPSs written for Teradyne's M9 Series DTI and L-Series Testers. Teradyne's damages expert, Christopher Gerardi, opined that Teradyne had to decrease its prices to win several government contract bids (i.e., price erosion), and that despite these decreased prices, Teradyne also lost contract bids (and associated sales) for other government programs seeking the same (i.e., lost profits). 17-ER-3853–91 ¶¶227-369 (relying on witness testimony, sales data, contracts, and bids to describe price erosion and lost profits for large-scale programs for the U.S. Army, Navy, Air Force, and Marine Corps).[9]

Indeed, the district court itself previously acknowledged in its own tentative *Daubert* ruling that such evidence reflected harm to the "market value" of the copyrighted works. In its *Daubert* motion challenging Teradyne's damages expert, ATS had argued that Teradyne's price erosion-related damages theory was not

---

[9] As set forth in Teradyne's exhibits, these programs commonly are referred to by the abbreviations eCASS, GMATS, GPATS, NGATS, and VDATS.

cognizable under copyright law, and that Teradyne's damages expert did not determine the market value of Teradyne's copyrighted works. 6-ER-1124–26. The district court rightly rejected ATS's argument, finding that a decrease in prices of Teradyne's test instruments incorporating the Teradyne Works represented an example of market harm to those works. *See* 2-ER-0061 ("if [Teradyne's damages expert] Gerardi determined there would be a decrease in the price that Teradyne was able to sell its products at because of Astronics' alleged infringement, how is that not an assessment of the 'market value' of Teradyne's work?").

Yet in its summary judgment ruling, the district court reversed course. *See* 1-ER-0045–46. This was error. Because Teradyne presented evidence of the harm to the value of the copyrighted works and to the actual market in which they were sold to consumers, the district court should not have granted summary judgment and should have submitted these factual disputes to the jury.

2. *The District Court Improperly Disregarded the Risk of Harm to Potential Markets for the Copyrighted Works*

The factor four analysis also entails examining the effect of the infringing use of the copyrighted works on *potential* markets where they may be sold in the future. This Court has also explained that potential markets include those for *derivative* works—"those that creators of original works would in general develop or license others to develop." *Dr. Seuss*, 983 F.3d at 460 (quoting *Campbell*, 510 U.S. at 592).

Here, ATS's copying has harmed that potential market for licensing the copyrighted works in exchange for compensation. Indeed, licensing of APIs—including in exchange for compensation—is common in many industries, and Teradyne presented evidence that industry members license APIs. For example, Teradyne's executive John Wood testified that "Teradyne will collaborate with companies (or will operate under a license agreement with companies) to emulate and replace legacy digital test instruments," and that Teradyne has licensed APIs from customers. 4-ER-0627 ¶18. Although Teradyne has not previously been approached (by ATS or others) for a license to its APIs (4-ER-0629 ¶23), that does not mean Teradyne would *never* license its APIs, including for the creation of derivative works. *Cf. Dr. Seuss*, 983 F.3d at 461 (rejecting as "speculative" defendant's argument that there would be no derivative work market because plaintiff had thus far chosen "not to license" derivative works, nothing that defendant "never asked for a license or permission"). Moreover, the harm to Teradyne's potential market for derivative or licensed works would be exacerbated if ATS's copying became widespread or universal. *See Campbell*, 510 U.S. at 587-89.

By failing to permit a jury to consider Teradyne's evidence of harm to a potential market for Teradyne's copyrighted works, the district court erred. *See Google*, 141 S. Ct. at 1199-1200, 1206.

48

3.    *The District Court Improperly Resolved a Material Factual Dispute Over Alleged Public Benefits*

In assessing the fourth factor, a court "must take into account the public benefits the copying will likely produce." *Google*, 141 S. Ct. at 1206.  Here, the district court set aside Teradyne's evidence of harm to the value of and market for the copyrighted works, finding instead that ATS's copying provided a public benefit.

Despite Teradyne's evidence of the potential harm associated with sanctioning copying such as ATS's, the district court actually ruled that such widespread copying *would be beneficial and weighs in favor of fair use*.  The court explained that if "[o]ther marketplace participants, current and/or future, could do what Astronics did here," then customers, including but not limited to the U.S. military, would benefit "from increased choice and price-competition."  1-ER-0048.  This reasoning turns the fair use analysis—and the very purpose of copyright law—on its head.  Moreover, while resolving these factual disputes in ATS's favor, the district court did not cite any record evidence.  *See* 1-ER-0046–49.

Indeed, in finding that enforcing Teradyne's copyright would result in "customers being 'locked-in' to [Teradyne's] device through their reliance on TPSs written for those devices," (1-ER-0048), the district court's analysis disregarded Teradyne's evidence on ATS's viable alternatives to achieve

49

compatibility that would not have required widespread copying. *See supra* Section III.A. Teradyne presented evidence that marketplace participants such as ATS can transition customers from one device to another with little *or no* copying, including by writing new TPSs, manually translating a customer's existing TPS, using software to translate customer TPSs, or creating a wrapper to provide an interface between customer programs and ATS's digital test instruments. 7-ER-1368 ¶279, 7-ER-1378–81 ¶¶305-310. If—as Teradyne contends—ATS could have provided such compatibility with less copying, or none at all, then the purported public benefits of compatibility do not justify a fair use finding here—especially given the harm that ATS's infringement inflicted on the value of the Teradyne's Works.

Further, the district court found that ATS's infringing software provided a public benefit by allowing the U.S. military to "avoid[] the risk and added expense that would be associated with having to entirely rewrite/recompile TPSs if it elects to use ATE from a manufacturer/supplier other than Teradyne." 1-ER-0047. The district court stated that Teradyne "does not dispute that the down-side risk from errors in the rewriting/recompiling process can be catastrophic." *Id.*

Yet Teradyne did dispute those contentions by ATS. Indeed, Teradyne submitted evidence refuting ATS's contentions as to both the risk and expense of rewriting/recompiling TPSs. Specifically, Teradyne's witnesses Teresa Lopes (4-ER-0633–34 ¶¶15-19) and John Wood (4-ER-0623 ¶7; 4-ER-0625–27 ¶¶13-17)

testified that (1) rewriting/recompiling TPS is a straightforward process, commonly used in the industry; and (2) any risk that a rewritten or recompiled TPS will not execute properly is mitigated by rigorous validation and certification process, until the risk is "vanishingly small." 4-ER-0628 ¶21. Moreover, they testified that, because there is some risk of error "each time a new TPS or instrument is introduced," the government has implemented "a rigorous validation process" to ensure that all new test instruments and their software run smoothly, regardless of whether they claim or how they might achieve backward-compatibility. 4-ER-0627 ¶18; 4-ER-0634 ¶19 (describing process to "mitigate the risks that come from changing the hardware or software used to perform a given test").

In other words, while ATS claims that its copying of Teradyne's copyrighted code was necessary to prevent a military catastrophe (for example, a plane crash or missile misfire), Teradyne's evidence shows that ATS's copying does not minimize such risks. Instead, those risks exist for both the introduction of any new DTI and rewriting/recompiling TPS. 4-ER-0627 ¶18; 4-ER-0634 ¶19. And various safeguards make the risk of such a catastrophe caused by imperfect backwards compatibility "vanishingly small;" and such backwards compatibility did not require unauthorized copying, let alone the extensive unauthorized copying engaged in by ATS. 4-ER-0628 ¶21.

The district court improperly resolved these disputes of fact in ATS's favor based on nothing but attorney argument and the say-so of ATS's President. 1-ER-0046–49. In doing so, the court usurped the role of the jury, which should have been afforded the opportunity to weigh the evidence and the credibility of Teradyne's and ATS's witnesses. For this reason alone, the case should be remanded.

## CONCLUSION

For the reasons set forth above, the district court's order granting summary judgment of fair use should be reversed, and the case remanded for trial.


Date: April 9, 2024

Respectfully submitted,

*s/ Matthew J. Rizzolo*

James R. Batchelder
ROPES & GRAY LLP
1900 University Avenue, 6th Floor
East Palo Alto, CA 94303
Tel: 650-617-4000

Douglas H. Hallward-Driemeier
Matthew J. Rizzolo
Kathryn Thornton
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel: 202-508-4600

Evan Gourvitz
Michael Morales
Meredith Foor
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
Tel: 212-596-9000

*Counsel for Appellant Teradyne, Inc.*

## STATEMENT OF RELATED CASES

The undersigned is unaware of any related cases currently pending before this Court.

Date: April 9, 2024

Respectfully submitted,

*s/ Matthew J. Rizzolo*
Matthew J. Rizzolo

*Counsel for Appellant Teradyne, Inc.*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,621 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2016 Times New Roman 14-point font.

Date: April 9, 2024

Respectfully submitted,

*s/ Matthew J. Rizzolo*
Matthew J. Rizzolo

*Counsel for Appellant Teradyne, Inc.*

## CERTIFICATE OF SERVICE

On April 9, 2024, the undersigned caused the foregoing document to be filed electronically by using the Court's CM/ECF system. All parties are represented by registered CM/ECF users and will be served by the appellate CM/ECF system.

Respectfully submitted,

*s/ Matthew J. Rizzolo*
Matthew J. Rizzolo

*Counsel for Appellant Teradyne, Inc.*